Section 7.02 <u>Covenant to Perform</u>.  The Company Parties and Department shall continue to perform their respective obligations under this Agreement, without interruption or slowdown, pending resolution of any dispute(s), unless the matter at issue precludes such continued activity.

Section 7.03 <u>Survival</u>.  This Section 7 shall survive termination or expiration of this Agreement.

**SECTION 8**
**INSURANCE**

Section 8.01    <u>Insurance Procurement; Duty to Maintain; Obligation to Provide Continuous Coverage</u>.

(a)    <u>Procurement</u>.  Throughout the term of this Agreement the Company, on its own behalf and on behalf of any one directly or indirectly employed by it for whose acts or omissions it may be liable, shall secure, or cause to be secured, and maintain, at its cost and expense, including premium payments, the following insurance policies with the below specified policy limits.  Cost and expense, including premium payments, will be separately identified but included in the Service Fee.

(1)    <u>Workers Compensation</u>.  Statutorily required workers compensation insurance, as well as employer's liability insurance in an amount not less than $1,000,000 for each accident, $1,000,000 each employee, $1,000,000 policy limit for disease, for all of the Company's employees to be engaged in work provided for in this Agreement and, in the event any such work is subcontracted, require the provision of workers compensation and employer's liability insurance for all of the employees of any subcontractor to be engaged in such work. Coverage shall be included to cover federal Longshoreman's and Harbor Worker's Act, the Federal Jones Act, and the federal Employee Liability Act.  The Company shall also maintain insurance covering it against claims for injury, disease or death of employees which, for any reason, may not fall within the provisions of a workers compensation law.  Policies hereunder shall include an "all states" endorsement, voluntary compensation endorsement, waiver of subrogation in favor of the Department, and Foreign voluntary compensation coverage.

(2)    <u>Motor Vehicle Liability</u>.  Motor vehicle liability insurance written in business auto policy form to protect the Company and any subcontractors provided use of Company's vehicles, including vicarious liability of subcontractors while operating subcontractor's vehicles, all while performing work covered by this Agreement.  Such coverage shall apply to claims for injuries, including accidental death to members of the public and damage to property of others arising from such use of motor vehicles, and such policies shall cover the operation on or off the site of all motor vehicles licensed for highway use whether they are owned, non-owned or hired.  Primary and non-contributory additional insured status should be provided to the Department on policies of the Company and its subcontractors.  The limits for such policies are as follows:  combined single limit of bodily injury and property damage each

57

accident $1,000,000, with symbol #1 on any auto; medical payments, each person, $5,000, symbol #2 on all owned autos; uninsured motorists, each accident, $1,000,000, symbol #2 on all owned autos; underinsured motorists, each accident, $1,000,000, symbol #2, all owned autos; comprehensive coverage $1,000 deductible, symbol #2, #8, all owned and hired autos; hired car physical damage coverage, $75,000 limit, $1,000 deductible, to be borne by the Company, comprehensive and collision. Exclusions for fellow employee and pollution liability shall be deleted. Employees shall be included as additional insureds while operating company owned or hired autos on business for the Department. Mental anguish and mental injury shall be included under bodily injury. Waiver of subrogation shall apply as agreed to by existing contracts and shall also be extended to the Department. Garagekeepers' direct primary and legal liability coverage shall be included with limits of $1,000,000, symbol #30, comprehensive and collision deductible of $500 to cover vehicles left in the insured's garages for safekeeping, storage and maintenance. Additional provisions will provide ninety (90) days written notice of cancellation and non-renewal to the Company and the Department and thirty (30) days notice of cancellation for non-payment of premium. To the extent such coverage is available in the insurance marketplace, there shall be no exclusions for terrorism or punitive damages or losses resulting from terrorism.

(3)    Comprehensive General Liability. Commercial general liability insurance to protect the Company against all claims arising from injuries to members of the public or damage to property of others, including loss of the use of tangible property damaged, arising out of any act or omission of the Company or its agents, employees or subcontractors. This policy or policies shall include appropriate endorsements to protect the Board and the Department against claims, demands and lawsuits from employees of the Company it contracts and any of its subcontractors. In addition, this policy shall specifically insure the contractual liability assumed by the Company under Section 6. Comprehensive general liability coverage shall contain the following provisions:

(A)    all premises and operations including work performed within 50 feet of railroad;

(B)    no exclusions for explosion, collapse, or underground damage;

(C)    contractor's protective coverage for independent contractors and subcontractors employed by the Company;

(D)    contractual liability for the obligations assumed in the indemnification provision in Section 6, and waiver of subrogation as provided in Section 8.02(a)(3);

(E)    personal injury liability, included in contractual liability coverage;

58

(F)     employees included as additional insureds (and deletion of fellow employee exclusion);

(G)     cross liability coverage;

(H)     incidental medical malpractice coverage;

(I)     contractual liability, including coverage for work which may be performed under this Agreement at railroad rights-of-ways;

(J)     coverage of operations involving the removal of hazardous materials, if such work is to be performed;

(K)     completed operation and product liability coverage for the period of three (3) years after the expiration or termination of this Agreement;

(L)     automatic reinstatement of aggregate liability limits or a provision requiring the Company to certify quarterly that the aggregate liability limits are fully available;

(M)     coverage for unintentional errors and omissions;

(N)     include waiver of government immunity;

(O)     broad form additional insured endorsement to pick up all insureds automatically as required by written or oral contract or permit;

(P)     waiver of subrogation in favor of the Department; automatic waiver of subrogation is to apply to entities as required by contract;

(Q)     mental injury or mental anguish and humiliation under definition of personal injury or under definition of bodily injury;

(R)     inclusion of directors, officers, administrators, volunteers and managers as additional insureds;

(S)     assault and battery coverage;

(T)     coverage for punitive or exemplary damages;

(U)     defense costs to be unlimited and to apply to all coverages outside policy limits;

59

(V)    under other insurance clause, policy to be excess over other collectable insurance afforded under policies purchased by other organizations, which include the Department and which name the Department as additional insured;

(W)    coverage for all mobile equipment owned by the Department to be covered both on and off premises;

(X)    coverage of property in the care, custody or control of the Department for which it is liable by contract or agreement;

(Y)    coverage for misdelivery of liquid products;

(Z)    amendment of other insurance provision endorsement to be attached;

(AA)   stop gap liability for all monopolistic states, if applicable;

(BB)   to the degree available in the insurance marketplace, there shall be no exclusions for terrorism; and

(CC)   to the degree available in the insurance marketplace, there shall be no exclusions for mold.

The liability limits shall not be less than $1,000,000 per occurrence and $2,000,000 aggregate.

(4)    Umbrella Excess Liability Insurance.  A policy or policies of umbrella excess liability insurance with liability limits of $50,000,000 each occurrence for all liability and $50,000,000 in the aggregate per policy year. The wording of the umbrella excess liability policy or policies shall be at least as broad as the primary or underlying policy or policies and shall apply both to the Company's general liability, automobile liability and employers liability insurance, (and shall be written on an occurrence basis). There shall be no exclusion of coverages for punitive damages. The Company is granted the option of arranging coverage under a single policy for the full limit required or by a combination of underlying policies with the balance provided by an excess or umbrella liability policy equal to the total limit(s) requested. No retention or deductible shall apply. First dollar legal defense and supplementary payment on all claims not covered by underlying insurance shall be included. If primary limits are exhausted, ninety (90) day provision for replacing primary limits shall be included. Appeals provision is to be amended to provide that if the insurance company initiates appeal and appeal judgment is in excess of policy limits, insurance carrier is responsible for amounts in excess of limits. If umbrella coverage limits are written in layers, each layer of coverage shall be concurrent with the full umbrella layer. In each layered policy, coverage shall comply with the first layer of controlling underlying umbrella. Premium shall be non-adjustable with no audit

60

provision. To the degree available in the insurance marketplace, the terrorism exclusion, if any, shall be deleted. Defense costs shall be outside policy limits. Subcontractors employed by the Company shall not be required to comply with this umbrella requirement.

        (5)    <u>Environmental Liability Insurance</u>. A policy or policies of environmental liability insurance with liability limits of $40,000,000 per occurrence and $40,000,000 aggregate. Such policy shall not contain a pollution exclusion clause and shall insure against bodily injury, property damage and economic loss arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants, including clean up costs, at or from any premises, site or location which is or was at any time owned or occupied by the Company, its contractors or subcontractors, under this Agreement, and shall also include coverage for actual, alleged or threatened discharge, dispersal, release or escape of pollutants which are or were at any time transported, handled, stored, treated, disposed of or processed as waste during or because of the work required under this Agreement by or for any insured or any Person for whom the Company may legally be responsible. Job sites shall be included for coverage. There shall be coverage for punitive damages.

        (6)    <u>Property Insurance</u>. A policy or policies insuring the Department and the Company against loss or damage of its property, property or others and loss of use. Coverage will be provided under special perils form including flood and earthquake. Sublimits for flood and earthquake will be agreed upon. There will be no coinsurance. Agreed amount coverage will be applicable. Deletion of the testing exclusion will apply. The exclusion for faulty design, workmanship or materials shall not apply to resultant loss to otherwise sound property. Subject to the blanket limits of liability, or sublimits for specific coverages, all coverages will include guaranteed replacement cost for buildings and personal property per the schedule to be provided. This will include leased or owned mobile equipment. Deductibles of $50,000, $100,000, $150,000, $200,000 and $250,000 will be considered. Property covered will include exterior signs, lights, fences, glass, walls, underground piping, wiring and foundations. Blanket time element coverage including EDP exposures and statement of values will be supplied. Blanket time element coverage (business interruption) will include ordinary payroll for 180 days, include 12 months extended period of indemnity, and include contingent business interruption at same blanket limit as business income. Ordinance or law coverage shall be included at same limit as blanket property limit. Time element coverages to apply to off premises power failure, sublimit $5,000,000, including above ground and below ground lines; water, telephone, electric and gas utilities; include cable and fiber optic cable. Transit limit of $500,000, with a $10,000 deductible is to be included for property transported by common or contract carrier, owned or leased vehicles, aircraft and rail. Newly acquired real and personal property with blanket limits of $2,000,000 shall be automatically covered, subject to minimum notification of 120 days. Coverage shall include business renovation. Builders risk limits for all scheduled properties shall be at same limits as blanket real and personal property. Replacement cost coverage is to apply to all leased equipment for which the Department or the Company is responsible. Replacement cost coverage for personal property of others in the care, custody and control of the Department is required. Joint loss agreements for property and boiler are included. EDP limits

will be a separate replacement cost blanket limit based upon schedule to be provided. These are in addition to the blanket property limits. EDP coverage is to apply to any computer-operated piece of equipment, software and communications equipment. Perils insured against shall be "All Risk" including flood, earthquake, mechanical breakdown, off premises power failure, above ground power lines and below ground power lines. The limit of coverage for unnamed locations shall be $2,000,000 blanket real and personal property. Boiler and machinery including miscellaneous electrical apparatus and business interruption with extra expense coverage will be included based upon values to be provided. Comprehensive form shall include production equipment. Sublimits shall be included as follows: ammonia contamination $500,000, expediting expenses $500,000, hazardous substance $500,000, water damage $500,000, and consequential damage and change in temperature $500,000. Coverage shall be included for broken or cracked pumps or water equipment subject to deductible. Off premises service interruption limit to be provided to include above ground electrical lines and below ground electrical lines. Debris removal limit of $10,000,000 shall be in addition to real and personal property limits. Business income is to include any increased period due to enforcement of law regulating control, repair, clean up or restoration including environmental damage. This coverage will also be inclusive of contingent business income. Business income coverage will include ordinance of law coverage for boiler and EDP. Terrorism coverage will be provided subject to a sublimit of $5,000,000. Additional terrorism coverage, if required by the Department, is subject to additional premium costs to be paid by the Department. Mold will be excluded as a peril, however, it will be covered if resultant damage arises from a covered loss.

(7)  Employment Practices Liability. The Company shall maintain during the life of this Agreement, employment practices liability insurance with minimum limits of $10,000,000 each loss and $10,000,000 annual aggregate. Maximum deductible or self-insured retention shall not exceed $250,000 annual aggregate. Named insured shall include both the Company and the Department as respects employees and operations of IWRC. Defense costs shall be in addition to policy limits. Policy shall be written on "Pay on Behalf of Insured" form. There shall be coverage for punitive damages. Significant exclusions should be noted in writing and coverage shall be subject to approval by the Department's insurance consultant.

(8)  Fiduciary Liability. The Company shall maintain during the life of this Agreement, fiduciary liability insurance with minimum limits of $10,000,000 each loss and $10,000,000 annual aggregate. Maximum deductible shall not exceed $250,000 annual aggregate. Named insured shall include both the Company and the Department as respects the employee benefit, pension and 401(k) plans for IWCR. Defense costs shall be in addition to policy limits. Policy shall be written on "Pay of Behalf of Insured" form. Significant exclusions should be noted in writing and coverage shall be subject to approval by the Department or by its insurance consultant.

(9)  Comprehensive Crime. The Company shall maintain during the life of this Agreement, comprehensive crime coverage with minimum limits as follows:

(A)   401(k) coverage to comply with ERISA requirements in an amount equal to or greater than 10% of plan assets; .

(B)   Blanket Employee Dishonesty (Form A) - $5,000,000 to include third party coverage naming as third party, the Department of Waterworks for The City of Indianapolis;

(C)   Forgery or Alteration (Form B) to include third party coverage naming as third party, the Department of Waterworks for The City of Indianapolis; and

(D)   maximum deductible aggregate options of $100,000 and $250,000 should be shown.

(b)   Duty To Maintain. Each policy shall be secured prior to the Commencement Date and the policies shall be continuously maintained through the term of this Agreement.

(c)   Continuous Coverage. The Company shall assure continuous coverage if any policy is canceled, not renewed or materially changed. The Company shall, at its own expense, pay such extra premium as required to assure no lapse of coverage for any time period.

(d)   Policies Of Insurance; Certificates As Evidence Of Insurance. Copies of all policies of insurance shall be furnished to the Department thirty (30) days prior to the Commencement Date for the Department's review and approval. If a policy is for any reason rejected by the Department or if a policy is canceled, not renewed or materially changed, a certificate for the substitute policy shall be submitted to the Department as early as possible before the commencement of the policy period for the Department's review and approval. The Company shall annually supply the Department with proof of insurance in the form of a policy or certificate.

Section 8.02. Policy Requirements And Company Obligations.

(a)   Required Provisions of Insurance Policies. The policy or policies procured, or caused to be procured hereunder, shall satisfy the following requirements:

(1)   Each policy shall specifically insure the Company's indemnification obligation under Section 6.01.

(2)   Each policy shall provide by endorsement that the Department is to be given notice ninety (90) days prior to every cancellation, non-renewal, or material change of such policy.

(3)   Each policy shall provide that the Company and the Company's insurers shall have no right of recovery or subrogation against the Department or the Company. The

intention of the Parties is that any insurance policy by the Company shall protect both Parties and it is intended to be the primary coverage for any losses covered by the insurance policies.

(4)     The Board, the Department and the employees of the Board and the Department shall be named as additional insureds or a primary and non-contributory basis with respect to the Company's commercial general liability policy, business or auto and umbrella policies. The additional insured status is limited to liability arising out of Waterworks operations conducted by the Company. As respects the property policy, the Board and the Department shall be listed as a second insured. The Company shall also include the municipalities served by the Department as additional insureds under the Company's comprehensive general liability policy or policies and on the Umbrella policy or policies. The Company will be responsible for premium payment and will receive loss proceeds on the part of the Department.

(5)     The insurance policy shall provide that the insurance company shall have no recourse against the Department for payment of any premiums or for assessments under any form of policy.

(6)     The Company shall be solely responsible to satisfy any and all deductibles and self-insured retentions contained in its insurance coverages as well as any excluded loss or losses if the same are within the Company's liability under this Agreement. The insurance may contain deductible limits to $250,000. If the Company desires higher deductibles on policies other than workers compensation, it must first obtain the prior written consent of the Department, which consent the Department may withhold.

(7)     Each company providing coverage required by this Agreement shall be licensed or approved by the Insurance Bureau of the State and shall have a financial rating no lower than XI and a policy holder's service rating no lower than (A-) as listed in the latest edition or interim report of Alfred M. Best's Key Rating Guide. The Company may request the Department to accept insurance companies with ratings below (A-) or XI; however, the Department is authorized to withhold such permission in its sole and absolute discretion.

(8)     The Department reserves the right at any time during the term of this Agreement to give notice to the Company that the Department has determined that a policy or policies procured in furtherance of this Section 8 are unsatisfactory to the Department as to form or substance or that the Department has determined that an insurance company which has issued any policy in furtherance of this Section 8 has become unsatisfactory to the Department. If the Company receives such a notice from the Department, it shall immediately obtain a new and substitute policy or policies and submit the same to the Department for approval as provided in Section 8.01(d) as if the policy or policies were rejected by the Department in the first instance.

(9)     The Company's failure to secure and maintain the insurance required under this Agreement shall not relieve the Company of its liability for any losses intended to be insured

64

thereby.  These insurance provisions shall not be construed or interpreted so as to conflict with the indemnification obligations of Section 6.

(10)    The Company's failure to secure and maintain the insurance required under this Agreement, notwithstanding any other provision of this Section 8, shall be deemed an Event of Default for purposes of Section 9.01.

(11)    The Company shall require all tiers of subcontractors to waive rights of recovery against the Department.  The Department must be listed as an additional insured on a primary and non-contributory basis under general liability, auto and umbrella policies as respects operations performed for the Company.

(12)    Broad form named insured endorsement shall apply to all policies.

(13)    Underwriting and rating data will be furnished to qualified bidders.

## SECTION 9
## EVENTS OF DEFAULT

Section 9.01 Events of Default by Company.  The following shall constitute Events of Default by the Company (each, a "Company Default") after the Commencement Date:

(a)    to the extent such failures or refusals are not otherwise covered in this Section 9.01, persistent and repeated failure or refusal of the Company to perform timely any obligation under this Agreement, unless such failure or refusal is clearly recognized, justified and excused by the terms and conditions of this Agreement.

(b)    failure of the Company to pay amounts owed to the Department under this Agreement within thirty (30) days following the date they become due and owing;

(c)    failure of the Company to meet any NPDES permit conditions or requirements on a regular basis, unless such failure is clearly recognized, justified and excused by the terms and conditions of this Agreement;

(d)    failure to comply with the Department's inspection rights as provided for in Section 4.06 and Exhibit 8;

(e)    failure to secure and maintain the insurance required under this Agreement as provided in Section 8.02(a)(10);

(f)    failure to maintain solvency, as determined under the applicable definition of "insolvent" contained in 11 U.S.C. §101(32), as amended.  The occurrence of any of the following are deemed a failure to maintain solvency:

(1)     Inability, failure, or refusal to pay debts as they mature; entry into an arrangement by the Company or the Guarantor with or for the benefit of their creditors; the Company's or the Guarantor's consent to or acquiescence in the appointment of a receiver, trustee, or liquidator for a substantial part of the Company's or the Guarantor's property; or

(2)     a bankruptcy, winding up, reorganization, insolvency, arrangement, or similar proceeding instituted by or against the Company or the Guarantor under the laws of any jurisdiction, which proceeding is not dismissed within sixty (60) days; or

(3)     any action or answer in a bankruptcy, winding up, reorganization, insolvency, arrangement, or similar proceeding in which the Company or the Guarantor approve of, consent to, or acquiesce in, any such proceeding; or

(4)     the levy of any distress, execution, or attachment upon the property of the Company or the Guarantor which shall substantially interfere with its performance hereunder; provided, however, that with respect to the Company only, this form of insolvency shall not be deemed to have occurred if the insolvency is caused primarily by the Department's failure to make a payment due pursuant to Section 5 within forty-five (45) days of when it becomes due and payable;

(g)     the default of the Guarantor under the Guarantee; or

(h)     failure to secure and maintain the Letter of Credit as required by, and in accordance with, the terms set forth in Section 12.01.

Section 9.02 Events of Default by Department. The following shall constitute Events of Default on the part of the Department (each, a "Department Default") after the Commencement Date:

(a)     to the extent such failures or refusals are not otherwise covered in this Section 9.02, persistent and repeated failure or refusal of the Department to perform timely any material obligation under this Agreement unless such failure or refusal is clearly recognized, justified and excused by the terms of and conditions of the Agreement; or

(b)     failure of the Department to pay amounts owed to the Company under this Agreement within thirty (30) days following the time they become due and payable.

Section 9.03 Default Notices; Opportunity to Cure. With the exception of a termination for the reason described in Section 10.01(a)(2), this Agreement shall not be terminated for an Event of Default unless and until (i) the Party contemplating termination gives the offending Party written notice in reasonable detail of each Event of Default the offending Party is alleged to have committed or permitted (a "Default Notice"), and (ii) the offending party shall have failed

to cure such Event of Default within thirty (30) days (or such longer period as may reasonably be required to diligently effect such cure) following delivery of the Default Notice to the offending Party. Notwithstanding the foregoing, if there are repeated Company Defaults under Section 9.01(a) through (d) then, regardless of attempts by the Company to cure the same, the Department, in its sole discretion, may terminate this Agreement without giving a Default Notice or affording the Company a period to cure.

## SECTION 10
## TERMINATION

Section 10.01 Termination for Event of Default.

(a)     Termination of Agreement for a Company Default.

(1)     If the Department gives the Company notice pursuant to Section 9.03 of the occurrence of a Company Default under Sections 9.01(a), (b) or (d), and the Company Default is not cured within the period set forth in Section 9.03, the Department may terminate this Agreement.

(2)     Upon the occurrence of a Company Default under one or more of Sections 9.01(c) or (e) through (h), the Department may terminate this Agreement immediately by delivery of a Default Notice to the Company.

(b)     Termination of Agreement for a Department Default. If the Company gives the Department a Default Notice pursuant to Section 9.03 of the occurrence of a Department Default, and such Department Default is not cured within the period set forth therein, the Company may terminate this Agreement.

Section 10.02 Termination for Labor Unrest. If, on or after the Commencement Date, personnel employed by the Company and performing services pursuant to the Company's obligations under this Agreement shall go on a labor strike or slowdown, or if a work stoppage, walkout or secondary boycott shall occur, for any reason or cause whatsoever, and such act or event effectively prevents the Company from performing its material obligations under this Agreement, the Department, during the pendency of the period in which performance is prevented, may, in its sole discretion, by notice to the Company, terminate this Agreement immediately.

Section 10.03 Termination for Uncontrollable Circumstances. If an Uncontrollable Circumstance shall occur after the Commencement Date relative to a material obligation of the Company or the Department under this Agreement and such Uncontrollable Circumstance or the effect thereof prevents performance of such material obligation for a period of thirty (30) days, the Department and the Company shall, during or after such thirty (30)-day period, meet to review the situation. If, despite the good faith efforts of the parties to reach an agreement, no

67

agreement is reached within a reasonable time considering the nature and extent of the Uncontrollable Circumstance, either party may terminate this Agreement upon notice to the other party.

Section 10.04 Termination for Insufficient Funding. In the event sufficient funds to pay for the Service Fee are unavailable, through the failure of any entity to appropriate funds or otherwise, the Department shall have the right to terminate the Agreement upon thirty (30) days prior notice.

Section 10.05 Termination for Adverse Tax Treatment. If the IRS or any other federal or state taxing authority issues or fails to issue any ruling, or imposes any requirement or obligation, in connection with the Department, the Company or this Agreement, which would adversely affect the tax exempt status of any bonds issued by the Department (in the sole judgment of the Department), the Department may terminate this Agreement upon thirty (30) days notice to the Company.

Section 10.06 Termination for Breach of Assignment Provision. The Company will not (i) assign or transfer this Agreement or its right, title or interests or obligations therein, in whole or in part, or (ii) voluntarily or involuntarily undergo a Change in Control without, in each instance, the Department's advance written approval, which the Department has the sole discretion to withhold. Violation of this section will constitute a breach of the Agreement and the Department may, in its sole discretion, terminate the Agreement. All rights, title and interest of the Company will thereupon cease and terminate.

For purposes of this Section only, "Change in Control" shall mean:

(a)     The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "1934 Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of 20% or more of either (i) the then outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (ii) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that the following acquisitions shall not constitute a Change in Control: (x) any acquisition by the Company, (y) any acquisition by an employee benefit plan (or related trust) sponsored or maintained either by the Company or any corporation controlled by the Company (for purposes of this section, only, "Affiliate"), or (z) any acquisition by a corporation pursuant to a reorganization, merger or consolidation, if, following such reorganization, merger or consolidation, the conditions described in clauses (i), (ii) and (iii) of subsection (b) of this Section 10.06 are satisfied; or

(b)     Approval by the shareholders of the Company of a reorganization, merger or consolidation, in each case, unless, following such reorganization, merger or consolidation, (i) more than 55% of, respectively, the then outstanding shares of common stock of the corporation

resulting from such reorganization, merger or consolidation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such reorganization, merger or consolidation in substantially the same proportions as their ownership, immediately prior to such reorganization, merger or consolidation, of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (ii) no Person (excluding the Company, any employee benefit plan (or related trust) sponsored or maintained by the Company, by an Affiliate, or by such corporation resulting from such reorganization merger or consolidation and any Person beneficially owning immediately prior to such reorganization, merger or consolidation, directly or indirectly, 20% or more of the Outstanding Company Common Stock or Outstanding Voting Securities, as the case may be) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such reorganization, merger or consolidation or the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors and (iii) at least a majority of the members of the board of directors of the corporation resulting from such reorganization, merger or consolidation were members of the incumbent board at the time of the execution of the initial agreement providing for such reorganization, merger or consolidation; or

(c)     Approval by the shareholders of the Company of (i) a complete liquidation or dissolution of the Company or (ii) the sale or other disposition of all or substantially all of the assets of the Company, other than to a corporation, with respect to which following such sale or other disposition, (x) more than 55% of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors is then beneficially owned, directly or indirectly, by all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such sale or other disposition in substantially the same proportion as their ownership immediately prior to such sale or other disposition, of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (y) no Person (excluding the Company and any employee benefit plan (or related trust) sponsored or maintained by the Company, by an Affiliate or by the corporation purchasing the assets and any Person beneficially owning, immediately prior to such sale or other disposition directly or indirectly, 20% or more of the Outstanding Company Common Stock or Outstanding Company Voting Securities, as the case may be) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of such corporation and the combined voting power of the then outstanding voting securities of such corporation entitled to vote generally in the election of directors and (z) at least a majority of the members of the board of directors of such corporation were members of the incumbent board at the time of the execution of the initial agreement or action of the board providing for such sale or other disposition of assets of the Company.

69

Section 10.07 <u>Remedies of the Department</u>.

(a)     If the Department terminates this Agreement pursuant to Sections 10.01(a) or 10.02, the Department shall have the right to seek legal and equitable remedies provided by law.

(b)     If the Department shall terminate this Agreement pursuant to Section 10.02, the Department shall pay the Company in addition to those payments and reconciliation amounts specified in Section 10.10, the Company's out-of-pocket costs as of the date of the termination, which shall in no event be greater than the amount of one Billing Month's Fixed Fee determined using the Billing Month of the termination.  If the Department shall terminate this Agreement pursuant to Section 10.03 (unless there has been no meeting), 10.04 or 10.05, or for failure of the Parties to agree on a re-negotiation of this Agreement, the Department shall pay the Company, in addition to those payments and reconciliation amounts specified in Section 10.10, its unamortized costs incurred in, developing, starting-up and performing its obligations under this Agreement, including (i) excess personnel costs during the first two (2) years following the Commencement Date as well as its work-in-process at the time of termination and (ii) the aggregate amount expended by the Company under the plans listed below and their successor plans:

(a)     IWC Resources Corporation Employees' Pension Plan;

(b)     IWC Resources Corporation Executive Supplemental Benefit Plan;

(c)     IWC Resources Corporation Deferred Compensation Plan;

(d)     Medicare Supplemental Health Insurance; and

(e)     Group Life, Health, Dental and Disability Plan of IWC Resources Corporation, as it relates to medical benefits for retirees,

after substantiating such costs to the reasonable satisfaction of the Department, not to exceed one Billing Year's Fixed Fee determined using the Billing Year of the termination.

Section 10.08 <u>Remedies of the Company</u>.  If the Company terminates this Agreement pursuant to Section 10.01(b) or 10.03, the Department shall pay the Company, in addition to those payments and reconciliation amounts specified in Section 10.10, the Company's unamortized costs incurred in, developing, starting-up and performing its obligations under this Agreement, including (i) excess personnel costs during the first two (2) years following the Commencement Date as well as its work-in-process at the time of termination and (ii) the aggregate amount expended by the Company under the plans listed below and their successor plans:

(a)     IWC Resources Corporation Employees' Pension Plan;

(b)     IWC Resources Corporation Executive Supplemental Benefit Plan;

(c)     IWC Resources Corporation Deferred Compensation Plan;

(d)     Medicare Supplemental Health Insurance; and

(e)     Group Life, Health, Dental and Disability Plan of IWC Resources Corporation, as it relates to medical benefits for retirees,

after substantiating such costs to the reasonable satisfaction of the Department, not to exceed one Billing Year's Fixed Fee determined using the Billing Year of the termination.

Section 10.09 Operations Cooperation and Transfer of Personnel.

(a)     If the Department or the Company terminates this Agreement, the Company shall, from the date of the notice of termination  make fully available its managers and employees performing services at the Waterworks for at least six months after the termination date pursuant to this Section 10.09 to continue to perform all the operation, maintenance, repair and management services contemplated in this Agreement.  The Department may determine that it requires a lesser amount of services, managers, employees and intellectual property  in order to provide a smooth and orderly transition of the operations and maintenance of the Waterworks to Department administrators, managers and personnel or, as applicable, the Department's contracted private Company; provided, however, in no event shall such provision of services by the Company exceed the twentieth (20th) anniversary date of this Agreement as measured from the Commencement Date.  The Company shall immediately transfer to the Department all intellectual property owned by the Department and used or created by the Company during the term of the Agreement, including, but not limited to, the Department's licenses, data, source codes and software, used in, updated or created for the operation of the Waterworks.  The Company shall fully cooperate with the Department to effectuate such a transition, including the provision of training and "know-how" in the procedures and techniques employed by the Company in meeting its obligations under Section 4.01.  The Department shall determine the number of days, if any, not to exceed ninety (90) days, that the Company shall comply with this Section 10.09(a).

(b)     Notwithstanding the termination of this Agreement, the Department shall compensate the Company for performing the services specified in Section 10.09(a) on a daily basis in an amount equal to the daily allocated cost of such services calculated on the basis of the Fixed Fee for the last full Billing Month immediately prior to the termination date; provided, however, such Fixed Fee shall be (1) calculated on the basis of a daily Fixed Fee and (2) reduced on a pro rata basis to reflect the number of Company employees performing services and the operations and maintenance services performed (the management fee and profit shall be reduced

pro rata to reflect the reduction in personnel and services) on a daily basis. The Company shall invoice the Department for such Fixed Fee as calculated pursuant to this Section 10.09(b) within fifteen (15) days after the end of each month after the termination date, and the Department shall pay to the Company the amount due and owing pursuant to this Section 10.09(b) within forty-five (45) days thereafter. The Company shall comply with the invoicing and date and information provisions of this Agreement in submitting any such invoice to the Department.

(c)    Upon receipt of notice of termination, the Company shall, at the option of the Department, cancel outstanding commitments for procurement of vehicles, services, materials and supplies. In addition, the Company must exercise all reasonable diligence to cancel or divert to other activities its outstanding commitments for procurement or personal services, if the Department, in its sole discretion so requires. If, after serving notice of termination for nonperformance or default, the Department determines that the reasons for nonperformance or default are excusable and are not the fault of and beyond the control of the Company, the Department may, in its sole discretion, authorize the Company to resume work.

(d)    The Company recognizes and understands that the transition outlined in this Section 10.09 may well result in the Department employing or attempting to employ some or all of the managers or personnel employed by the Company and performing services at the Waterworks. The Company shall facilitate the transfer and employment of any manager(s) or personnel who may desire to be employed by the Department. The Company shall have no covenant not to compete or other restrictions on the Department hiring Company employees working on the Waterworks.

(e)    Upon the termination or expiration of this Agreement, the Company shall assign to the Department its interest in all contracts entered into by the Company relative to the Waterworks if requested by the Department, if such contracts do not prohibit such assignment. The Department's right to request assignment of certain contracts shall not be read as an obligation by the Department to assume all or any of such contracts. The Department shall, however, assume the payment and performance of all contracts assigned to it and shall pay any penalties and costs incurred by the Company with respect to the assignment of such contracts. The Company shall exercise all reasonable efforts in negotiating contracts relative to the Waterworks to (1) obtain the written consent of the other parties to such contracts to the assignment by the Company of its rights therein to the Department and (2) secure contract terms and conditions that do not include damages or penalties to any assignee with respect to any assignment.

(f)    In the event of a Company Default, the Department may, in its discretion, determine to perform any Company obligation under this Agreement that the Company has failed to perform. The Department may issue a Default Notice informing the Company of the Department's intent to perform such obligation(s). The Company shall be obligated to reimburse the Department for all costs the Department incurs in the performance of such Company obligation(s). The Department's performance under this paragraph (f) shall not effect a cure of

72

the Company Default; such cure period shall be tolled during the period the Department is performing the Company's obligations.

(g)    If the Department has notified the Company of a Company Default and the Department determines, in its sole discretion, that the public supply of water or the public safety is threatened by the Company Default, the Department may assume operation of the Waterworks pending termination of this Agreement and direct Company employees, or contract with others, to take such actions as the Department deems necessary or appropriate to assure the public supply of water or protect the public safety. Any costs incurred by the Department in such respect shall be paid by the Company.

Section 10.10 <u>Manner of Termination Payment</u>.

All performance and payment obligations under this Agreement, including payment of the Service Fee that is due and owing, shall continue pursuant to the terms of this Agreement until this Agreement terminates and any amount accrued but unpaid prior to termination shall, if due and owing, be payable in accordance with this Section 10.10. Except as otherwise specifically provided in this Agreement with respect to the time of payment following termination, within ninety (90) days following termination of this Agreement, the Department and the Company shall reconcile all amounts then due and payable to each other under the terms of this Agreement. Upon reaching, as a result of such reconciliation, the total amount of the outstanding unpaid balance which the Department and the Company owe the other, the Department and the Company shall, within thirty (30) days thereafter, make the final payments in complete discharge of their obligations under this Agreement, except those obligations which survive the termination or expiration of this Agreement. Payment obligations under this Section are subject to Sections 13.14 and 13.15.

Section 10.11 <u>Remedies</u>.

(a)    The remedies specifically set forth in this Agreement are exclusive, and the Parties waive any other remedies they may have at law or in equity; <u>provided</u>, <u>however</u>, that either Party may seek judicial enforcement of any remedy provided herein and any amounts payable hereunder. The Parties agree and acknowledge that the damages provided for in this Section 10 are to be liquidated damages and shall be the sole and exclusive measure of damages or liability for termination of this Agreement by a Party under this Section 10 and that the provisions for damages set forth herein are intended to measure as accurately as possible the direct damages of the Party entitled to such damages and are not intended to include punitive, special, consequential, incidental or indirect damages.

Section 10.12 <u>Survival</u>. This Section 10 shall survive the termination or expiration of this Agreement.

73

Section 10.13 <u>Employee Benefit Plans</u>.  Effective as of the date on which this Agreement terminates, the Company shall spin off, and the Department shall assume, or shall cause a successor contractor to assume: (i) the assets and liabilities of all employee benefit plans attributable to employees of the Waterworks and persons retired from the Waterworks and (ii) the assets and liabilities related to the Retiree Medical Benefits.

## SECTION 11

## REPRESENTATIONS

Section 11.01 <u>Representations of Department</u>. The Department represents to the Company:

(a)     The Department is duly organized and an existing special taxing district under the laws of the State and is duly authorized to carry on the governmental functions and operations as contemplated by this Agreement and Indiana Code 8-1.5-4.

(b)     As of the Contract Date, the Department has the power, authority and legal right to enter into and perform this Agreement and the execution, delivery and performance hereof by the Department (1) have been duly authorized by the Department, acting by and through its Board, (2) do not require any other approvals by any other governmental officer or body, other than (A) USEPA, IDNR, or IDEM approval, if required, and (B) those permits or approvals that may have to be renewed or reissued during the term of this Agreement, (3) do not require any consent or referendum of voters, (4) will not violate any judgment, order, law or regulation applicable to the Department, and (5) do not constitute a default under, or result in the creation of, any lien, charge, encumbrance or security interest upon any assets of the Department under any agreement or instrument to which the Department is a party or by which the Department or its assets may be bound or affected.

(c)     This Agreement has been duly entered into by the Department and, as of the Contract Date constitutes a legal, valid and binding obligation of the Department, enforceable in accordance with its terms, subject to (1) the applicable bankruptcy, reorganization, moratorium or similar laws affecting enforcement of creditors' rights or remedies generally, (2) general equitable principles concerning remedies, (3) limitations on the enforceability of rights to indemnification by federal or State laws or regulations or pubic policy and (4) the valid exercise of the constitutional powers of the Department, the State and the United States of America.

(d)     To the best of the Department's information and belief and without independent investigation, as of the Contract Date, there is no action, suit or proceeding, at law or in equity, before or by any court or governmental authority, pending or threatened against the Department, wherein an unfavorable decision, ruling or finding would materially adversely affect the performance by the Department of its obligations hereunder, or which, in any way, would adversely affect the validity or enforceability of this Agreement, or any other agreement or

74

instrument entered into by the Department in connection with the transaction contemplated hereby.

(e)     The Department reviewed the representations and warranties contained in the Asset Purchase Agreement.

(f)     The Company understands and acknowledges that none of the Department Parties make any representation or warranty, express or implied, as to the accuracy or completeness of the due diligence materials reviewed by the Company.  The Company agrees that none of the Department Parties shall have any Liability to the Company or to any Company Party relating to or resulting from the use of the due diligence materials or any errors therein or omissions therefrom.  Only those representations and warranties that are made in this Agreement will have any legal effect.

(g)     Except as set forth in Exhibit 13, there are no actions, suits, investigations, or proceedings pending against the City or the Department, or to the knowledge of the City or the Department, threatened, asserting any right or entitlement to Retiree Benefits.

Section 11.02 Representations of Company.  The Company hereby represents to the Department that subject to the Disclosures in Exhibit 9:

(a)     The Company is qualified to do business in the State and is duly qualified to do business wherever necessary to carry on the business and operations contemplated by this Agreement.

(b)     As of the Contract Date, the Company has the power, authority and legal right to enter into and perform its obligations set forth in this Agreement, and the execution, delivery and performance hereof, (1) have been duly authorized, (2) do not require the approval of any governmental office or body, other than (A) USEPA, IDNR, or IDEM approval, if required, and (B) those permits or approvals that may have to be renewed or reissued during the term of this Agreement, (3) will not violate any judgment, order, law or regulation applicable to the Company or any provisions of the Company's articles of incorporation and by-laws, and (4) do not constitute a default under or result in the creation of, any lien, charge, encumbrance or security interest upon any assets of the Company under any agreement or instrument to which the Company is a party or by which the Company or its assets may be bound or affected.

(c)     As of the Contract Date, there has been no material adverse change in the Company's or the Guarantor's financial condition which would impair the Company's ability to perform its obligations under this Agreement or the Guarantor's ability to fulfill its obligations under the Guarantee.  After the Contract Date, the Company and Guarantor shall immediately report any material adverse change in its business to the Department.

75

(d)   This Agreement has been duly entered into and delivered and constitutes a legal, valid and binding obligation of the Company, fully enforceable in accordance with its terms, subject to (1) the applicable bankruptcy, reorganization, moratorium or similar laws affecting enforcement of creditors' rights or remedies generally, (2) general equitable principles concerning remedies and (3) limitations on the enforceability of rights to indemnification by federal or state laws or regulations or public policy.

(e)   As of the Contract Date, there is no action, suit or proceeding, at law or in equity, before or by any court or governmental authority, pending or, to the best of the Company's knowledge, threatened against the Company, wherein an unfavorable decision, ruling or finding would materially adversely affect the performance by the Company of its obligations hereunder, or which, in any way, would adversely affect the validity or enforceability of this Agreement, or any other agreement or instrument entered into by the Company in connection with the transaction contemplated hereby.

(f)   As of the Contract Date, (i) the Company's proposal is genuine and not collusive or a sham, (ii) the Company has not colluded, conspired, connived or agreed directly or indirectly with any other proposer or Person, to put in a sham proposal, or to refrain from proposing, and (iii) the Company has not in any manner directly or indirectly, sought by agreement or collusion, or communication or conference with any Person, to fix the prices of its proposal or proposals of any other proposer or to secure any advantage against any Person interested in this Agreement. All statements contained in the Company's proposal are true, and the Company has not directly or indirectly submitted its proposal or the contents thereto, to any association or to any member or agent thereof.

(g)   By signing this Agreement, the Company acknowledges it has visited the key sights and has been provided access to documents as deemed appropriate by the Department. The Company also acknowledges that it has been provided the opportunity to request, and has been provided, additional documentation as it deems appropriate in order to satisfy its due diligence requirements. Company understands that risk is inherent in any due diligence process and that the due diligence process and associated price for the management of the Waterworks reflects the risk associated with this process.

(h)   The provisions of this Agreement related to exclusive jurisdiction are enforceable against each Company Party.

Section 11.03 Materiality of Representations. The representations enumerated in Sections 11.01 and 11.02 are material for purposes of this Agreement and misrepresentations are grounds for an Event of Default.

## SECTION 12

## LETTER OF CREDIT

76

Section 12.01        Irrevocable Standby Letter of Credit.   During the term of this Agreement and continuing thereafter until all monetary obligations of the Company have been discharged, the Department shall be provided an irrevocable, direct draw letter of credit (the "Letter of Credit") in a form satisfactory to the Department, and in the amount of forty million dollars ($40,000,000) (the "Base LC Amount").   Upon the occurrence of a Company Default, the Department shall be permitted to make one or more draws on such Letter of Credit in amounts which Department determines, in its reasonable discretion, to be appropriate.   Each bank at which such Letter of Credit is established and/or maintained shall be subject to the approval of the Department.   Each such bank shall be instructed that it is to honor any draft the Department may present, without prior notice to the issuer.   Also, such bank shall be instructed that it shall have no objection rights to payment to the Department and that the Company or the Guarantor shall not have first claim rights to such Letter of Credit.   If the Letter of Credit is not renewed by the bank and a substitute Letter of Credit is not received by the Department at least five (5) business days before the expiration date (or if the Department does not receive an irrevocable commitment from another bank acceptable to the Department to issue a replacement standby Letter of Credit, effective upon the expiration of the then-effective Letter of Credit), then the Department shall be able to draw the Letter of Credit in full, regardless whether the Company is in default.   In the event of a partial draw on the Letter of Credit, within five (5) business days thereafter, the Company shall cause the amount drawable under the Letter of Credit to be restored to the Base LC Amount. .The Company will be repaid for any draws made on the Letter of Credit by the Department:

(a)        to the extent the amount drawn exceeds the amount of damages to the Department if the Company cures the Company default; and

(b)        to the extent the amount drawn exceeds the amount of damages to the Department if the Company reinstates an expired Letter of Credit.

## SECTION 13

## MISCELLANEOUS

Section 13.01 Term. Unless sooner terminated in accordance with its term, this Agreement shall expire on the twentieth anniversary of the Commencement Date.

Section 13.02 Assignment.  The Department reserves the right to assign its rights and obligations under this Agreement to any validly constituted agency, department or authority of the State, or the City or a duly created municipal corporation or authority.  The Department will provide the Company with prior notice of such an assignment.  Such assignee will have full authority to enforce and manage the Agreement, unless otherwise specified by the Department. The Company will not assign or transfer the Agreement or its right, title or interests or obligations therein, in whole or in part, without in each instance the Department's advance

written approval, which approval is in its sole discretion; provided, however, that the Company may assign its interest without such consent to any Affiliate, successor or Parent of the Company if the Company shall remain liable for all obligations under this Agreement, and the Guarantors, pursuant to the Guarantee, fully guarantee the performance of such assignee's obligations under this Agreement. Violation of the terms of this paragraph will constitute a breach of the Agreement and the Department may, in its discretion, cancel the Agreement upon written notice. All rights, title and interest of the Company will thereupon cease and terminate. It is understood and agreed between the Parties that this Section 13.02 shall not be construed or interpreted to restrict the Company's ability to employ subcontractors in connection with performance of portions of its obligations hereunder.

Section 13.03 Equal Employment Opportunity, Local Involvement, Minority Owned Enterprises, Women Owned Enterprises.

(a)     To the extent not inconsistent with Section 4.02, the Company shall use its best efforts consistent with Applicable Law to ensure that minority business enterprises ("MBEs") and women-owned business enterprises ("WBEs") shall have the maximum practicable opportunity to compete for work with respect to this Agreement. The Company is required to comply with all applicable federal, State and local directives respecting equal employment opportunity programs.

(b)     The Company shall maximize involvement of a diversified group of local firms ("Local Providers") that have capabilities to provide and complete the Services and those Additional Services implemented within the District described in Section 4.05(f) ("Local Services"). Under the terms of this Agreement, the Company shall provide and complete Local Services in accordance with Exhibit 12. The Company shall:

(1)     require Local Providers either to (i) maintain their principal office in the District or (ii) provide and complete the Local Services with personnel 90% of whom have as their assigned location an office in the District;

(2)     require the Local Providers to maintain and expand existing workforce in the District;

(3)     not contract with any Local Provider without first notifying the Department of such anticipated contract and providing the Local Provider's name, address, telephone number, capabilities and description of work to be performed by the Local Provider;

(4)     exercise the appropriate supervision of and control over the Local Providers so that the Local Providers will perform the Local Services in a manner which will not damage the Company and/or the Department;

78

(5)    be responsible for all aspects of performance of the Local Providers in performing the Local Services; and

(6)    prohibit any one subcontractor to perform more than 30% of the Local Services in any one year; provided, however, that the Department may waive such prohibition, in its sole discretion.

The Department, in its sole discretion, may waive this provision or part thereof upon proper documentation by the Company of the lack of available, capable resources by Local Providers for a particular task.

(c)    The Company shall use its best efforts to utilize District-based minority-owned and women-owned business enterprises in connection with the services to be provided under this Agreement in an amount equal to at least twelve percent (12%) of the purchases/contracts available for placement on an annual basis, comprising at least ten percent (10%) MBEs and two percent (2%) WBEs.  The Company shall utilize best efforts to exceed both goals and progressively increase participation during the term of the Agreement.  The Company shall use its best efforts to utilize MBEs and WBEs certified with the City, or any political subdivision in the District, through the Division of Equal Opportunity.

The Department, in its sole discretion, may waive this provision, or any part thereof, upon receipt of a written report from the Company describing minority programs implemented and maintained by Company Parties that do not quality as MBEs or WBEs, but which satisfy the Department's desire to promote minority business in the District.

Section 13.04 Further Assurances.  Each Party agrees to execute and deliver any instruments and to perform any acts that may be necessary or reasonably requested in order to give fill effect to this Agreement.  The Department shall execute such further instruments and documents and take such action as may be reasonably requested by the Company and not inconsistent with the provisions of this Agreement and not involving the assumption of obligations other than those provided for in this Agreement to carry out the intent of this Agreement.

Section 13.05 Relationship of Parties.  (a)    Except as otherwise explicitly provided herein, neither the Company  nor the Department shall have any responsibility whatsoever with respect to services provided or contractual obligations assumed by any Company Party or Department Party, respectively, and nothing in this Agreement shall be deemed to constitute any Company Party or Department Party a partner, agent, employee or legal representative of any other Party or to create any fiduciary relationship between or among the Parties.  The Parties agree that the Company has, on its behalf and on behalf of any Company Parties performing services, entered into this Agreement and shall be performing the services contemplated herein as an independent contractor.  As an independent contractor the Company and the Company Parties are solely responsible for the means, methods, techniques, procedures and schedules used to

79

perform the work. The Company has the sole right to control and direct the means, manner and method by which the obligations of this Agreement are satisfied.

(b)     the Revenue Procedure provides that the Company must not have any role or relationship with the Department that, in effect, substantially limits Department's ability to exercise its rights, including cancellation rights, under the contract. The Revenue Procedure contains a safe harbor for this element. In order to satisfy this safe harbor, the Company agrees to the following requirements:

(1)     Not more than 20% of the voting power of the governing body of the Department, the City or the Bond Bank in the aggregate can be vested in the Company and its directors, officers, shareholders, and employees.

(2)     Overlapping board members cannot include the chief executive officers of the Company or its governing body or the Department, the City or the Bond Bank or its respective governing body.

(3)     The Department, the City, the Bond Bank and the Company under this Agreement cannot be related parties.

Nothing in this Agreement may be interpreted to mean the Department may exercise control over how services are provided by the Company nor how the Company satisfies its obligations under the Agreement. Nothing in this Agreement may be interpreted to give the appearance that the Company possesses the apparent or actual authority to act or speak for the Department and the Company shall not by words, act or representations convey to the general public, any person or any governmental unit the impression that the Company has the authority to speak or act for the Department. If any Person believes that the Company has the necessary power to bind the Department or believes that the Department has the power to control how services are provided by the Company. The Company shall take actions as are necessary to correct the erroneous inferences and prevent reliance on such a mistake of fact.

(e)     The Department reserves the right to adopt a bond resolution to acquire the Waterworks, to issue its bonds as set forth therein, and to sell those bonds to the Bond Bank. The terms of the Bond Documents shall govern any conflicts or differences between this Agreement, the Bond Documents and the RFP.

Section 13.06 Notices and Authorized Representatives.

(a)     All notices, consents, approvals or communications required or permitted hereunder shall be in writing and shall be transmitted by (1) registered or certified mail, postage prepaid, return receipt requested, with notice deemed to be given upon receipt, or (2) delivered by hand or nationally recognized courier service, or (3) if sent by telex or facsimile transmission with confirmed receipt thereof, and addressed as follows:

80

To the Company:

James H. Buckler
Operations Manager
USFilter Operating Services, Inc.
1220 Waterway Boulevard
Indianapolis, Indiana  46202

If By Hand:

same

Copy to:
John M. Wood
Vice President
USFilter Operating Services, Inc.
55 Shuman Boulevard
Naperville, Illinois 60563

Copy to:
T. Michael O'Brien
Vice President and General Counsel
USFilter Operating Services, Inc.
55 Shuman Boulevard
Naperville, Illinois 60563

To the Department:

Department of Waterworks
Consolidated City of Indianapolis, Marion County, Indiana
Suite 1601, City-County Building
200 E. Washington Street
Indianapolis, Indiana 46204
Fax:  (317) 327-3968

Copy to:

Consolidated City of Indianapolis, Marion County, Indiana
Suite 1601, City-County Building
200 E. Washington Street
Indianapolis, Indiana 46204
Attn:  A. Scott Chinn, Esq., Corporation Counsel

Fax: (317) 327-3968

Changes in the respective addresses to which such notices may be directed may be made from time to time by any Party by written notice to the other Party.

(b)     For purposes of this Agreement, the Parties' Authorized Representative is as follows:

For Company:        James H. Buckler

For Department:     Secretary/Treasurer of the Board

Either Party may change its authorized representative at any time by written notice to the other Party.

Section 13.07 Waiver.  The waiver by either Party of a default or a breach of any provision of this Agreement by the other Party shall not operate or be construed to operate as a waiver of any subsequent default or breach.  The making or the acceptance of a payment by either Party with knowledge of the existence of a default or breach shall not operate or be construed to operate as a waiver of such default or breach or any subsequent default or breach.

Section 13.08 Entire Agreement; Modifications and Amendments.  The provisions of this Agreement, including the present and all future Exhibits, together with the RFP, the RFP questions and the Department's answers, the Proposal, the Revised Proposal, the video tape of the presentation given to the Department on February 19, 2002, the "best and final offers," the letter accompanying the "final and best offers," and the Bond Documents (the "Ancillary Agreements"), shall (a) constitute the entire agreement between the Parties for the operation and maintenance of the Waterworks and except as specifically set forth herein, such Ancillary Agreements shall supersede any negotiation, proposal or agreement, written or oral, prior to the date of each Ancillary Agreement, there being no agreements or understandings other than those written or specified herein, (b) to the extent the information contained in two or more of the above referenced Ancillary Agreements directly conflicts, the documents shall govern in the following order of priority:  Bond Documents, Management Agreement and Exhibits, "best and final offers," including the letter accompanying "best and final offers," Revised Proposal, Proposal, RFP questions and Department answers, video tape of the presentation given to the Department on February 19, 2002, (c) this Agreement shall be deemed to include the oral and written promises made in the Ancillary Agreements to the extent such promises do not conflict with the Agreement, and (d) unless otherwise specifically recognized in this Agreement, the Ancillary Agreements and this Agreement shall not be modified or amended except by written agreement duly entered into and executed by the Parties with the same formality as this Agreement.

82

Section 13.09 <u>Headings</u>. Captions and headings and the Table of Contents in this Agreement, exclusive of Exhibits, are for ease of reference only and do not constitute a part of this Agreement.

Section 13.10 <u>Governing Law</u>. This Agreement and any questions concerning its validity, construction or performance shall be governed exclusively by the laws of the State, without respect to conflicts of law principals and irrespective of the place of execution or of the order in which the signatures of the Parties are affixed or of the place or places of performance.

Section 13.11 <u>Consent to Jurisdiction</u>.   The Company, for itself and on behalf of the Company Parties hereby irrevocably consents to the personal and subject matter jurisdiction of the Marion Circuit Court, Indianapolis, Indiana and the venue for all legal actions before the Circuit Court for Marion County, Indiana, in connection with any action or proceeding arising out of or relating to the Agreement or any document or instrument delivered with respect to any of the obligations hereunder, and waive personal service of any process in connection with any such action or proceeding and agrees that the service thereof may be made by hand delivery or by certified or registered mail directed to the other party and its counsel at its address as set forth in this Agreement.  The Company, for itself and on behalf of the Company Parties, hereby irrevocably consents to the jurisdiction of the IURC and IDEM in connection with any of the responsibilities undertaken by the Company as set forth in this Agreement.

Section 13.12 <u>Counterparts</u>. This Agreement may be executed in more than one counterpart, each of which shall be deemed to be an original.

Section 13.13 <u>Severability</u>. In the event that any provision of this Agreement shall, for any reason, be determined to be invalid, illegal, or unenforceable in any respect, the Parties hereto shall negotiate in good faith and agree to such amendments, modifications, or supplements of or to this Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the Parties as reflected herein, and the other provisions of this Agreement shall, as so amended, modified, supplemented, or otherwise affected by such action, remain in full force and effect.

Section 13.14 <u>Interest on Overdue Payments</u>. All payments to be made under this Agreement by either Party outstanding after the applicable due date shall be compounded annually at the prime rate of National City Bank of Indianapolis, Indiana.

Section 13.15 <u>Payment Disputes</u>. If any Party shall dispute an amount owing to the other Party, such Party shall:

(a)      give notice to the other Party of such disputed amount together with sufficient information to allow the other Party to understand the nature of the dispute delivered on or before the due date of the amount disputed; and

83

(b)    pay all undisputed amounts on the due date. Interest at the rate specified in Section 13.14 shall accrue from the original due date on disputed amounts, or the portions thereof, to the Party which is ultimately determined to be entitled to such disputed amount, or any portions of such disputed amounts.

Section 13.16 Liability of Officers and Employees. No member of the Board nor any director, officer, agent, consultant, representative or employee of either Party shall be charged personally by the other or held contractually liable thereto under any term or provision of this Agreement, because of either Party's execution or attempted execution or because of any breach or alleged breach thereof; provided, however, that all Persons remain responsible for any of their own criminal actions.

Section 13.17 Pledge of Credit. The Company shall not pledge the Department's credit or make it a guarantor of payment or surety for any contract, debt, obligation, judgment, lien or any form of indebtedness or the Department's revenues therefrom. The Company further warrants and represents that it has no obligation or indebtedness that would impair its ability to fulfill the terms of this Agreement.

Section 13.18 Third Party Beneficiary. This Agreement is intended to be solely for the benefit of Company and Department and their successors and permitted assigns and is not intended to and shall not infer any rights or benefits on any third party not a signature hereto, except as specifically set forth herein.

Section 13.19 Public Relations. Within one year after the Commencement Date, the Company shall implement a public relations program approved by the Department, including:

(a)    a public outreach program; and

(b)    a technical advisory group composed of academic and industry experts that will report to and serve at the pleasure of the Department.

The Company shall annually report the Department its public relation activities in the District.

Section 13.20 Condensed Schedule. Company hereby acknowledges and accepts that the schedule for the process of selection for this Agreement was condensed. The Department provided access to all documents it deemed appropriate and provided access to documents as requested by any offeror, subject to its discretion. Additionally, tours of specific facilities were conducted. Company was also encouraged to perform its own evaluation or inspection of sites, facilities, information (i.e. reservoirs, intakes, towers, web-sites, etc.) to those areas that are considered public access and do not require the approval of the Department or IWC.

84

Should material variances of cost estimates, prices, values, etc. be discovered after the execution of these Agreement for operations of these Waterworks, the condensed schedule of this process and any associated effects of this condensed schedule cannot be considered grounds for changing any prices or parts of the Company's proposal as submitted.

The schedule of events follows:

| EVENT | DATE |
|---|---|
| RFQ Issued | December 4, 2001 |
| LOQ Due | December 14, 2001 (unless submitted with Proposal) |
| RFP Issued | December 21, 2001 |
| First RFP Notice | December 28, 2001 |
| Deadline for Written Questions; Second RFP Notice | January 7, 2002 |
| Answers to Written Questions | January 14, 2002 |
| Proposals Due | February 8, 2002 |
| Negotiations of Best and Final Offers End | February 25, 2002 |
| Management Agreement Recommended to the Board | February 26, 2002 |
| Management Agreement Approved by the Board, subject to City-County Council Approval | March 5, 2002 |
| Management Agreement Approved by City-County Council | March 18, 2002 |
| Execution of Management Agreement | March 21, 2001 |
| Company begins Management of the Waterworks | April 30, 2002 |

Section 13.21 <u>Observation Rights</u>.  Any member of the Board or any person designated by the Board shall have observation rights with respect to the Company's board meetings.

Section 13.22 <u>Retainage of Intellectual Property Rights</u>.

(a)    The Company hereby grants to the Department the irrevocable and unrestricted right to use all formulas, processes, know-how, technology, innovations, computer software, trade secrets and other intellectual property (the "Intellectual Property") owned by the Company or its Affiliates on the Commencement Date and used, developed, upgraded, enhanced or otherwise improved by the Department or the Company and/or its Affiliates in connection with the performance of their obligations pursuant to this Agreement, both during the term of this Agreement and after its expiration or termination; provided, however, the Department may not sell, license or formally authorize any other Person to use the Intellectual Property, but the Department and its employees and representatives may discuss, publish or otherwise freely and publicly communicate information concerning the Intellectual Property.  Any license the Department has under this Section 13.22 shall not be transferable by the Department.  The Department acknowledges and agrees that the Intellectual Property owned by the Company or its Affiliates on the Commencement Date and used, developed, upgraded, enhanced or otherwise improved by the Department or the Company and/or its Affiliates in connection with the performance of their obligations pursuant to this Agreement shall remain the property of the Company or its Affiliates both during the term of this Agreement and after its expiration or termination.

(b)     The Department hereby grants to the Company and its Affiliates the irrevocable and unrestricted right to use all the Intellectual Property owned by the Company on the Commencement Date and used, developed, upgraded, enhanced or otherwise improved by the Company and/or its Affiliates or the Department in connection with the performance of their obligations pursuant to this Agreement, both during the term of this Agreement and after its expiration or termination; provided, however, the Company may not sell, license or formally authorize any other Person to use the Intellectual Property, but the Company and its Affiliates and their employees and representatives may discuss, publish or otherwise freely and publicly communicate information concerning the Intellectual Property.  Any license the Company and its Affiliates have under this Section 13.22 shall not be transferable by the Company or its Affiliates.  The Company acknowledges and agrees that the Intellectual Property owned by the Department and used, developed, upgraded, enhanced or otherwise improved by the Department or the Company and/or its Affiliates in connection with the performance of their obligations pursuant to this Agreement shall remain the property of the Department both during the term of this Agreement and after its expiration or termination.

(c)     For purposes of preserving the Department's and the Company and its Affiliates' right to use the Intellectual Property after termination of the Agreement, the Parties hereby agree to escrow the Intellectual Property with a mutually agreed to third-party escrow agent pursuant to mutually acceptable terms and conditions.

86

Section 13.23 <u>Retainage of Patented Invention Rights</u>.

(a)     The Company retains exclusive rights to all its patented inventions and, subject to Section 13.22, copyrighted materials, developed by the Company in connection with the performance of its obligations pursuant to this Agreement, provided that the Company will, at the expiration or termination of this Agreement, grant to the Department, a non-exclusive, non-transferable permanent license to use such inventions in the Waterworks for an annual fee of one dollar ($1.00).

(b)     The Department retains exclusive rights to all its patented inventions and, subject to Section 13.22, copyrighted materials, developed by the Department in connection with the performance of its obligations pursuant to this Agreement, provided that the Department will, at the expiration or termination of this Agreement, grant to the Company and its Affiliates, a non-exclusive, non-transferable permanent license to use such inventions in the Waterworks for an annual fee of one dollar ($1.00).

(c)     For purposes of preserving the Department's and the Company and its Affiliates' right to use the patented inventions and copyrighted materials after termination or expiration of this Agreement, the Parties hereby agree to escrow the patented inventions and copyrighted materials and the Intellectual Property with a mutually agreed to third-party escrow agent pursuant to mutually acceptable terms and conditions.

Section 13.24 <u>Assignment of Rights Against NiSource Inc</u>.   To the extent permitted by law, the Department will assign and subrogate to the Company any rights, remedies or other claims that it may have against NiSource Inc. for any default or breach of representations and warranties concerning the Waterworks or the transactions otherwise contemplated hereby, which default or breach causes or may cause damage to the Company.

87

[This Page Intentionally Left Blank]

In Witness Whereof, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on March 21, 2002.

"DEPARTMENT"

The Consolidated City of Indianapolis

By:  Department of Waterworks

By: _John n. Mutz_____
            Chairman

"COMPANY"

USFilter Operating Services, Inc.

By: _____
        Executive Vice President

Reviewed and approved as to form.

_____
        Department of Legal Services

18915_2

89

In Witness Whereof, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives on March 21, 2002.

"DEPARTMENT"

The Consolidated City of Indianapolis

By:  Department of Waterworks

By:  _____
                  Chairman

"COMPANY"

USFilter Operating Services, Inc.

By:  _____
             Executive Vice President

Reviewed and approved as to form.

_____
             Department of Legal Services

18915_2