UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON BOND and DAVID LEAR, individually and as class representatives of all those similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CASE NO. 1:08-cv-0634-DFH-JMS |
| v. | ) | |
| | ) | |
| VEOLIA WATER INDIANAPOLIS, LLC, and VEOLIA WATER NORTH AMERICA, OPERATING SERVICE, LLC, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON JOINT MOTION TO REMAND

Plaintiffs Jason Bond and David Lear seek to represent a class of customers of the public utility that provides water service in Indianapolis.  Plaintiffs filed the action in state court, and plaintiff Leslie Bridges then filed a parallel action in state court.  Defendants removed both cases to federal court based on the Class Action Fairness Act of 2005 ("CAFA"), codified in part as 28 U.S.C. § 1332(d), which dramatically expanded federal diversity jurisdiction over class actions.  Plaintiffs have moved to remand both cases to state court.  The briefing for both cases has been done in this case.  Plaintiffs rely on the local controversy, home state controversy, and interests of justice exceptions to CAFA in section 1332(d)(4)(A), (d)(4)(B), and (d)(3), respectively.  The applicability of all three exceptions ultimately turns on only one issue – the citizenship of defendant Veolia

Water Indianapolis, LLC.  As explained below, that defendant is a citizen of both Indiana and Delaware for purposes of CAFA, so plaintiffs' motion to remand is granted.

I.      *The Parties and the Claims*

In 2002, the City of Indianapolis acquired the assets of what had been a privately owned public water utility serving the Indianapolis area.  The city entered into a twenty-year management agreement with a predecessor of defendant Veolia Water North America Operating Services, LLC, for the operation and maintenance of the water utility, including meter-reading, billing, and collection functions.  That entity assigned the Indianapolis contract to defendant Veolia Water Indianapolis, LLC.  Pl. Ex. G at 4.

Plaintiffs Jason Bond and David Lear are retail customers served by the Indianapolis water works operated by Veolia Water Indianapolis under the management agreement.  They allege that the management agreement requires defendants to read meters at least every two months so that bills are based on actual water usage.  Plaintiffs allege further that defendants have deliberately chosen to read meters less often and to over-estimate water use, so that bills are based for several months at a time on excessive estimates of water use.  The effect of this practice, according to plaintiffs, is that defendants save on operating expenses and receive small interest-free loans from all of their customers.

Plaintiffs' complaint alleges claims arising under state law:  for breach of contract, negligence, violations of the Indiana deceptive practices act, Ind. Code § 24-5-0.5-3, and constructive fraud.  No class has been certified at this point.[1]

The complaint names three defendants, but one no longer exists.  (The court has modified the caption as above to reflect only the two defendants.)  Defendant Veolia Water Indianapolis, LLC ("Veolia Indianapolis") is a limited liability company.    Veolia Indianapolis has its headquarters and operations in Indianapolis.  Its sole business is operation of the Indianapolis water works under the management agreement with the city.  Pl. Ex. B, ¶ 10.  Veolia Indianapolis' sole member is defendant Veolia Water North America Operating Services, LLC ("Veolia North America"), also a limited liability company.  Veolia North America

---

[1]A few days after I first began working on this motion, I received a water bill from Veolia, which made me recognize that I am a member of the potential plaintiff class.  (I did not check to see whether the bill was based on estimated or actual use.)  I have considered whether I should disqualify myself from these cases.  At this point, based on guidance from the Codes of Conduct Committee of the Judicial Conference of the United States, I do not believe I need to do so or should do so.  As a general rule, where a class has not been certified, the only parties are those named in the complaint or otherwise joined:

> A judge who is a putative member of an uncertified class, but who does not have a pre-existing asset, property interest, or contractual relationship linked to the proceeding, does not have a financial interest in the subject matter or other interest that could be substantially affected (Canon 3C(1)(c)).  Nor is the judge disqualified under Canon 3C(1) unless he or she has a non-negligible amount at stake in the issue raised by the class action.

Compendium of Selected Opinions § 3.1-6[4] (a-1) (2007).  If the cases were to proceed in federal court and if a plaintiff class were certified in the future, then I and relatives within three degrees of relationship would need to decide whether to opt out of the class.  If I and such relatives did not opt out, then I would need to disqualify.  *Id.*, § 3.1-6[4](c).

says that it has its headquarters in Illinois, and it has a much broader business purpose:  to design, build, operate and manage various types of water service facilities, programs, and systems in a number of different locations in North America.  See *id.*, ¶ 9.

Tracing ownership further upstream, Veolia North America's sole member is another limited liability company, Veolia Water America, LLC, whose sole member is yet another limited liability company, WASCO, LLC.  WASCO has only one member, Veolia Environnement North America Operations, Inc., which is a Delaware corporation with its principal place of business in Delaware.  That Delaware corporation's parent company is Veolia Environnement, SA, whose stock is traded publicly on Euronext Paris and on the New York Stock Exchange. Additional facts about the defendants are discussed below where relevant.

II.     *The Class Action Fairness Act*

The parties agree that the case fits all the requirements for CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(2)(A).  The matter in controversy exceeds five million dollars and at least one member of the putative class is a citizen of a state different from at least one defendant.

To support remand, plaintiffs rely on several exceptions to CAFA.  The interests of justice exception in § 1332(d)(3) allows a court to remand a class

action in which more than one-third but fewer than two-thirds of the members of the proposed plaintiff classes and "the primary defendants" are citizens of the forum state, based on consideration of the nature of the claims, whether state law governs, and several other factors.   The local controversy exception in § 1332(d)(4)(A) requires a district court to remand a case in which:

> (I)   greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
>
> (II)   at least 1 defendant is a defendant –
>
>> (aa)   from whom significant relief is sought by members of the plaintiff class;
>>
>> (bb)   whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
>>
>> (cc)   who is a citizen of the State in which the action was originally filed; and
>
> (III)   principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
>
> (ii)   during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons. . . .

The home-state controversy exception in § 1332(d)(4)(B) requires a district court to remand a case in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."  These exceptions to CAFA were an important part of the legislative compromise between federal and state court

power.  See S. Rep. No. 109-14, at 27-28 (2005), reprinted in 2005 U.S.C.C.A.N. 3, 27-28.  Under CAFA, the burden is on plaintiffs to show that one or more of these exceptions apply.  *Hart v. FedEx Ground Package System Inc.*, 457 F.3d 675, 680 (7th Cir. 2006).

A suit by local utility customers asserting only state law claims against the local utility would seem to be a good candidate for these exceptions.  In fact the parties' briefs show that they disagree on only one element of each of the three exceptions:  whether any defendant is a citizen of the forum state, Indiana.  The only candidate is Veolia Water Indianapolis, LLC, so the remand decision depends on the citizenship of that entity.  Its citizenship presents two issues.  The first is purely legal.  The second is a mixed question of law and fact.

First, Veolia Indianapolis is a limited liability company.  Defendants argue that Veolia Indianapolis thus takes on the citizenship of its members pursuant to *Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998), and its progeny.  Tracing back through multiple layers of LLCs, one eventually winds up with a Delaware corporation with its principal place of business in Delaware.  Under the *Cosgrove* approach, Veolia Indianapolis would not be deemed a citizen of Indiana and the cases would stay in federal court under CAFA.

Plaintiffs rely on the CAFA provision codified in 28 U.S.C. § 1332(d)(10): "For purposes of this subsection and section 1453, an unincorporated association

shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." Plaintiffs contend that subsection (d)(10) is a limited legislative modification of the rule applied in *Cosgrove* and other cases, and that Congress thus chose to treat partnerships and limited liability companies and other business entities like corporations for purposes of determining citizenship under CAFA. As explained below, the court agrees with plaintiffs on this issue.

That leads to the second question. Plaintiffs acknowledge that Veolia Indianapolis is organized under Delaware law and thus is a citizen of Delaware. Plaintiffs contend that its principal place of business is in Indiana, thus making it also a citizen of Indiana, so that the court should remand under all three of the available exceptions to CAFA. Defendants contend that, even though all Veolia Indianapolis executives, employees, and operations are located in Indiana, the "nerve center" of Veolia Indianapolis, and thus its principal place of business, is in Illinois, where its parent Veolia North America has its offices. If that is correct, the cases must stay in federal court.

III.   *Citizenship of Unincorporated Associations under CAFA*

The court concludes that § 1332(d)(10) applies to Veolia Indianapolis, so that its citizenship must be determined as if it were a corporation, making it a citizen of the state under whose laws it is organized and of the state where its

principal place of business is located.  To address the issue in terms of statutory language, the issue is whether the phrase "unincorporated association" in section 1332(d)(10) means whatever the phrase means under the relevant state's law or whether it carries the broader meaning used by the Supreme Court in deciding the citizenship of entities other than corporations.  The larger context and purpose of CAFA and the case law to which it responded show clearly that "unincorporated association" was intended to carry the broader meaning to address perceived anomalies in federal diversity jurisdiction.

Congress enacted CAFA to expand federal diversity jurisdiction to include broad categories of class actions in which minimal diversity is present (where at least one member of the plaintiff class has a citizenship different from at least one defendant) and more than five million dollars is at issue.  See S. Rep. No. 109-14, at 27-28.  As part of CAFA, Congress chose to modify existing case law concerning the citizenship of unincorporated associations.  Section 1332(d)(10) provides: "For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized."  That provision modifies case law dealing with a number of business forms other than conventional corporations. *E.g.*, *Kitson v. Bank of Edwardsville*, No. 06-528, 2006 WL 3392752, at *7 n.3 (S.D. Ill. Nov. 22, 2006) (recognizing legislative modification of earlier court precedents).  The Supreme Court has held that a limited partnership takes on the citizenships of all of its partners, both general and limited.  *Carden v. Arkoma*

*Associates*, 494 U.S. 185, 195-96 (1990).  The Seventh Circuit has followed *Carden* to hold that limited liability companies are also unincorporated associations that also take on the citizenships of all of their members.  See *Cosgrove*, 150 F.3d at 731, followed in *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007), and *Intec USA, LLC v. Engle*, 467 F.3d 1038, 1041 (7th Cir. 2006), among others.

In *Carden v. Arkoma Associates*, the Supreme Court made clear that Congress is principally responsible for adapting federal jurisdiction to the wide assortment of artificial entities created under state law:  "the course we take today does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial organization, as it honors the more important policy of leaving that to the people's elected representatives."  494 U.S. at 197.  The Court acknowledged that it had long ago carved out a special jurisdictional rule for corporations, but in other respects had left the issue to Congress.  *Id.*

For purposes of this case, the issue is whether the Veolia Indianapolis limited liability company is an "unincorporated association" within the meaning of section 1332(d)(10).  Under *Carden* and *Cosgrove*, the answer is yes, for the statutory language was chosen to address that body of case law.  See S. Rep. No. 109-14, at 45-46.  The foundation of first *Carden* and then *Cosgrove* is that artificial business entities other than corporations are *all* treated as unincorporated associations until Congress provides otherwise:

> The 50 States have created, and will continue to create, a wide assortment of artificial entities possessing different powers and characteristics, and composed of various classes of members with varying degrees of interest and control.  Which of them is entitled to be considered a "citizen" for diversity purposes, and which of their members' citizenship is to be consulted, are questions more readily resolved by legislative prescription than by legal reasoning, and questions whose complexity is particularly unwelcome at the threshold stage of determining whether a court has jurisdiction.  We have long since decided that, having established special treatment for corporations, we will leave the rest to Congress; we adhere to that decision.

*Carden*, 494 U.S. at 197; accord, *Cosgrove*, 150 F.3d at 731 ("Given the resemblance between an LLC and a limited partnership, and what seems to have crystallized as a principle that members of associations are citizens for diversity purposes unless Congress provides otherwise, . . . we conclude that the citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members.") (citations omitted).  That rule applies to general partnerships, limited partnerships, limited liability companies, and any other species in the menagerie of modern business organizations – so long as they are not called some type of "corporation."  See *Hoagland v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 738-39 (7th Cir. 2004) (holding that a "professional corporation" is treated as a corporation for diversity purposes).

Defendants derive from the cases a different point, that the court should look to the law of the state of organization to determine how an organization should be treated for diversity jurisdiction purposes.  *Hoagland* provides some superficial support for that argument.  In holding that a Missouri professional

corporation should be treated as a corporation, the Seventh Circuit chose to defer to the state law's label of "corporation" as controlling.   Defendants argue that Delaware law, under which Veolia Indianapolis organized as a limited liability company, distinguishes between limited liability companies and unincorporated associations.   Compare Del. Code Ann. title 6, § 18-201(a), (c) (filing requirements for limited liability companies), with Del. Code Ann. title 6, § 3104 (different filing requirements for an "unincorporated association of persons" transacting business.   Defendants reason that whatever else Veolia Indianapolis might be, it is definitely not, under Delaware law, an unincorporated association, so that it should not be subject to CAFA's special rule in section 1332(d)(10).

Adopting the narrower state-law meaning of the phrase would produce an interesting paradox.   It would also unduly complicate diversity jurisdiction decisions under CAFA and undermine the congressional effort to simplify matters in subsection (d)(10).

The paradox is this:  Under defendants' reasoning, Veolia Indianapolis is not an unincorporated association under Delaware law, so its citizenship should be determined under the general law applicable to limited liability companies – *i.e.*, *Cosgrove* and its progeny, which hold that the LLC takes on the citizenships of all members.   But if we apply the law of *Cosgrove*, we are applying the general rule for determining the citizenship of *all kinds* of unincorporated associations.   That's the rule applied in *Carden v. Arkoma Associates* and *Cosgrove* and their progeny.

See *Belleville Catering Co. v. Champaign Market Place, LLC*, 350 F.3d 691, 692 (7th Cir. 2003) (holding that Delaware limited liability company was unincorporated enterprise like a partnership for purposes of diversity jurisdiction).   In other words, defendants' argument would require the court to conclude first that Veolia Indianapolis is *not* an unincorporated association for purposes of subsection (d)(10), but then to determine its citizenship under *Cosgrove* because it *is* an unincorporated association for purposes of diversity jurisdiction.

        Such mental gymnastics are not unknown to students of federal jurisdiction, of course, but the contradiction is a bright caution sign.  The more fundamental problem is that defendants' position would complicate what Congress explicitly tried to simplify and would prevent subsection (d)(10) from achieving its clear purpose.  In *Carden*, the Supreme Court had acknowledged that its decisions in this field could be criticized as "technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organization."  494 U.S. at 196.  That prediction was correct.  Subsection (d)(10) was the result, drafted to respond to the Supreme Court's broad rule applied to a wide variety of unincorporated associations, stemming from cases such as *United Steelworkers of America v. R.H. Bouligny, Inc.*, 382 U.S. 145 (1965), and followed in *Carden*.  The Senate committee report on CAFA explained:

        New subsection 1332(d)(10) provides that for purposes of this new
        section and section 1453 of title 28, an unincorporated association shall be
        deemed to be a citizen of a state where it has its principal place of business
        and the state under whose laws it is organized.  *This provision is added to*

> *ensure that unincorporated associations receive the same treatment as corporations for purposes of diversity jurisdiction.*  The U.S. Supreme Court has held that "[f]or purposes of diversity jurisdiction, the citizenship of an unincorporated association is the citizenship of the individual members of the association."  This rule "has been frequently criticized because often * * * an unincorporated association is, as a practical matter, indistinguishable from a corporation in the same business."  Some insurance companies, for example, are "inter-insurance exchanges" or "reciprocal insurance associations."  For that reason, federal courts have treated them as unincorporated associations for diversity jurisdiction purposes.  Since such companies are nationwide companies, they are deemed to be citizens of any state in which they have insured customers.  Consequently, these companies can never be completely or even minimally diverse in any case.  It makes no sense to treat an unincorporated insurance company differently from, say, an incorporated manufacturer for purposes of diversity jurisdiction.  New subsection 1332(d)(10) corrects this anomaly.

S. Rep. No. 109-14, at 45-46 (emphasis added; footnotes 130-32 omitted).  This passage shows that Congress used the phrase "unincorporated associations" as broadly as the Supreme Court had used it in the case law.  In a footnote to the quoted passage of the report, the Senate committee cited criticism of the case law based on the anomaly that associations treated under state law as distinct juridical entities were treated as unincorporated associations by the federal courts.  *Id.* at n.131, citing 14 A.L.R. Fed. 849 (2004).[2]

For subsection (d)(10) to solve the problems it was intended to solve, the court must reject defendants' argument and must apply the term "unincorporated

---

[2]To argue for a much narrower meaning of the phrase "unincorporated association," defendants have quoted some definitions from completely different contexts, such as capacity to sue under Fed. R. Civ. P. 17(b) and related issues under state law.  See Def. Br. 15.  Torn from their contexts, these quotations offer no help in understanding the congressional response in subsection (d)(10) to jurisdictional anomalies for business entities other than corporations.

associations" as broadly as the Supreme Court had applied it in creating the problems Congress wanted to solve.  Congress and the courts recognized that state law treated a wide range of unincorporated associations as juridical entities for purposes of state law, including limited liability companies.  In enacting subsection (d)(10) as part of CAFA, Congress directed the courts to treat all such entities like corporations for purposes of CAFA jurisdictional issues.  It is difficult to think of language that could have expressed that intention any more clearly than to use the same phrase that the Supreme Court had used in *Carden* and *United Steelworkers of America v. R.H. Bouligny, Inc.*  See, *e.g.*, *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001) (observing that where Congress uses phrase that has taken on clear meaning through judicial interpretation, Congress presumably intends phrase to have the same meaning).

By comparison, if the courts were to accept defendants' argument here, the result would be a multiplication of different rules that would undermine the evident purpose of subsection (d)(10).  Through CAFA, Congress directed the courts to change the rules established by case law for a wide range of unincorporated associations that are organized in some fashion under state law and have an identifiable principal place of business.  If the courts were to accept defendants' argument here, the courts would have to exclude from that treatment all entities that state law does not treat, for different purposes, as unincorporated associations.  The courts would then decide issues regarding the citizenship of all of those entities under the older case law, with all of its anomalies that Congress

was trying to change with subsection (d)(10).  In other words, the courts would undo subsection (d)(10).

The better approach here is the simpler one, which is more consistent with the language and purpose of CAFA.  The court treats the term "unincorporated associations" in subsection (d)(10) as broadly as the Supreme Court had treated it in *United Steelworkers of America v. R.H. Bouligny, Inc.* and *Carden*, so that subsection (d)(10) applies to the limited liability company Veolia Indianapolis in this case.[3]

IV.    *The Principal Place of Business of Veolia Indianapolis*

A.    *Statutory Standard*

Under subsection (d)(10), Veolia Indianapolis is a citizen of Delaware because it is organized under Delaware law, and it is also a citizen of the state where its "principal place of business" is located.  By adopting the same language that applies to corporations under 28 U.S.C. § 1332(c), CAFA calls upon courts to apply the same test that applies to corporations.

---

[3]Nothing in *Hoagland* conflicts with this analysis.  In *Hoagland*, the Seventh Circuit was deciding a narrow question:  whether a "professional corporation" under state law should be treated like any other corporation for purposes of diversity jurisdiction.  The Seventh Circuit chose to follow the state law label of "corporation," 385 F.3d at 743, but the court did not signal any intent to blur or complicate the jurisdictional treatment of the wide variety of entities and associations that are not called "corporations."

When applying this statutory standard to corporations, the Seventh Circuit applies the "nerve center" test.  See *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986); *Sabo v. Standard Oil Co. of Indiana*, 295 F.2d 893, 895 (7th Cir. 1961).  This nerve center test has been distinguished from the "place of operations" test and the "total activity" test.  See generally *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 914-15 (10th Cir. 1993) (reviewing approaches and adopting total activity test).  The differences among these tests may be more linguistic than doctrinal.  See *id.* at 915, quoting 13B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3625, at 625 (2d ed. 1984); accord, *J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 407-08 (5th Cir. 1987) (discussing Seventh Circuit's actual applications of "nerve center" test that take into account the locations of operations as well as headquarters); *Topp v. CompAir, Inc.*, 814 F.2d 830, 834 (1st Cir. 1987) (recognizing three "distinct, but not necessarily inconsistent tests" in the case law); *North Star Hotels Corp. v. Mid-City Hotel Associates*, 696 F. Supp. 1265, 1270 (D. Minn. 1988), quoting *Mahoney v. Northwestern Bell Telephone Co.*, 258 F. Supp. 500, 502 (D. Neb. 1966) (describing split of authority as "largely linguistic," since cases applying any test consider location of executive offices, management activity, and operations), *aff'd*, 377 F.2d 549 (8th Cir. 1967).  Under the Seventh Circuit nerve center test, a company may have only one principal place of business.  See *Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220, 1223 (7th Cir. 1991).

In *Sabo*, the Seventh Circuit held that Standard Oil of Indiana's "nerve center" was in Illinois. The large oil company had extensive operations in fifteen states. Its headquarters was in Illinois, where all officers and department heads resided, where tax returns were filed, where company records and audits were kept, where credit card transactions and collections matters were handled, where the principal bank account was located, and where the board of directors met. 295 F.2d at 893-94. More recently, the Seventh Circuit has described the nerve center as the location of the "corporation's brain," which is ordinarily its headquarters. *Wisconsin Knife Works*, 781 F.2d at 1282.

When dealing with related corporations, such as parent and subsidiary, the principal place of business test must be applied to the entity that is the relevant party, without confusing the principal places of business of the distinct entities (unless a party shows that one is merely the alter ego of another). See, *e.g.*, *Topp*, 814 F.2d at 834-35 (finding that district court erred in applying nerve center test by taking into account operations and headquarters of the relevant party's parent corporations and by looking for nerve center of entire conglomerate of affiliated companies); *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir. 1972) ("where the corporate separation between a parent and subsidiary, 'though perhaps merely formal,' is 'real' and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through ownership or otherwise"); see also *deWalker v. Pueblo Int'l, Inc.*, 569 F.2d

1169, 1171 (1st Cir. 1978) (reversing district court's finding that parent company with headquarters in Puerto Rico had its principal place of business in New York based on activities of separate subsidiary headquartered in New York); *Lurie Co. v. Loew's San Francisco Hotel Corp.*, 315 F. Supp. 405, 410 (N.D. Cal. 1970) (holding that defendant operating company had its principal place of business in California, even if its management took direction from parent company with offices in New York:  so long as corporate separation is maintained, "the separate place of business of the subsidiary is recognized in determining jurisdiction, even though the parent corporation exerts a high degree of control through corporate ownership or otherwise"), citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925).

In *Topp v. CompAir*, the district court had applied the nerve center test by tracing the corporate decision-making power for the defendant upstream to the chief executive officer of the corporation that owned the corporation that owned the defendant.  That was an error, held the First Circuit:

> So long as that [defendant] corporation is entitled to be viewed as a separate corporate entity, *see infra*, the nerve center test does not search for the locus of its parent corporation, nor of those having the ultimate controlling interests.  *The test, in other words, does not search out the home of the economic tsar who ultimately dominates, through other corporations or otherwise, the entity in question.*  Rather, so long as the entity's corporate form is entitled to credibility, *the nerve center test looks for the localized nerve center from which the corporation in issue is directly run*.  If this were not so, every independently incorporated, wholly owned subsidiary which is part of a large conglomerate would be treated (for diversity jurisdiction purposes) as a mere division of a large company rather than a separate corporation.

-18-

814 F.2d at 835 (emphasis added).  As shown below, defendants in this case are inviting the court to make essentially the same error that led to reversal in *Topp v. CompAir*, by focusing on the headquarters of the parent rather than of the subsidiary, which is the relevant party.[4]

      B.     *Facts Relevant to the Principal Place of Business*

Veolia Indianapolis' business is the operation of the Indianapolis water works, under the management agreement with the City of Indianapolis.  Veolia Indianapolis has approximately 375 employees.  All work in Indianapolis.  All

---

[4]Defendants cite several district court decisions to support the claim that the location of a company's shareholders is a factor under the nerve center test. See *Jackson v. American Coal Co.*, No. 05-4166, 2006 WL 181682, at *1 (S.D. Ill. Jan. 23, 2006), quoting *Chamberlain Mfg. Corp. v. Maremont Corp.*, 828 F. Supp. 589, 591 (N.D. Ill. 1993), citing in turn *Ratner v. Hecht*, 621 F. Supp. 378, 380 (N.D. Ill. 1985).  A focus on the location of a company's shareholders seems to conflict with the principle that the issue is the defendant's principal place of business, not its corporate parent's location. See *Topp*, 814 F.2d at 834-35.  Upon closer scrutiny, though, *Ratner* and *Chamberlain* do not actually support consideration of the shareholders' locations.  The key passage quoted from *Chamberlain* is from the district court's summary of the magistrate judge's recommendation, which the district court reversed.  828 F. Supp. at 590-91. *Ratner* listed the location of shareholders as a factor, but it did so without citing authority on the point.  In addition, *Ratner* is not a reliable guide to the nerve center test because it failed to apply the nerve center test, as the *Chamberlain* court pointed out.  See 828 F. Supp. at 591, quoting *Ratner*, 621 F. Supp. at 381. *Jackson* used the shareholder factor, but it relied on this shaky foundation without addressing the difference between the principal place of business of the defendant and that of its corporate parents.  2006 WL 181682, at *2.  Some of the earlier cases mentioned the location of shareholder meetings as a factor, along with the location of director meetings and executive offices, *e.g.*, *Holman v. Carpenter Technology Corp.*, 484 F. Supp. 406, 410 (E.D. Pa. 1980), but the residences or locations of a party's shareholders should not make any difference in identifying the principal place of business of the party itself.

executives of Veolia Indianapolis are located in Indianapolis, including those responsible for operations, production, customer services, field services, labor relations, purchasing, business development, and strategic planning.  Pl. Ex. N. All operational activities occur in Indiana, including meter reading, billing, collection, and customer service.  Hiring and firing decisions are made in Indiana. Veolia Indianapolis maintains two bank accounts in Indiana for customer payments.  Veolia Indianapolis has additional bank accounts in Illinois and Michigan.

Veolia Indianapolis also lists its current "principal office" with the Indiana Secretary of State as located in Indianapolis.  Under Indiana law, limited liability companies are required to provide that information to the state.  For those purposes, "principal office" means "the office, within or outside of Indiana, so designated in the biennial report where the *principal executive offices* of a domestic of foreign limited liability company are located."  Ind. Code § 23-18-1-18 (emphasis added).[5]

Veolia North America's business is much broader in scope than Veolia Indianapolis.  Pl. Ex. B, ¶ 9.  Veolia North America's offices are at an undisclosed

---

[5]Defendants argue that this filing is irrelevant, citing *Buethe v. Britt Airlines, Inc.*, 787 F.2d 1194, 1196 (7th Cir. 1986), in which the Seventh Circuit wrote that a party's "registered office" with the incorporating state (Illinois) did not reflect the principal place of business because it could be only a mail drop or a lawyer's office.  The governing Indiana statute for LLCs requires much more substance in the principal place of business than did the Illinois law on "registered offices."

location in Illinois.[6]   Veolia Indianapolis' management reports to Veolia North America's management.   Veolia North America's management makes major strategic decisions, in consultation with Veolia North America's own parent(s). Def. Ex. 1, ¶ 9.   Veolia North America sets parameters for the management of Veolia Indianapolis, so that Veolia North America must give approval to capital projects, contracts, loans, and other transactions above certain dollar thresholds. It appears, however, that Veolia North America does not have direct dealings with the city or its Board of Waterworks.

Defendants assert that Veolia Indianapolis has no general counsel of its own but relies on Veolia North America's general counsel in Illinois.  Def. Ex. 2, ¶ 9. Plaintiffs counter with evidence that Veolia Indianapolis has its own inside attorney who works in the Indianapolis headquarters.  Pl. Exs. J at 2, K, L at 3.

The court has considered the possibility of an evidentiary hearing to flesh out some additional details, such as the roles of the two attorneys.  See, *e.g.*, *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (*en banc*) (court is free to weigh evidence to determine whether jurisdiction has been established); *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)

---

[6]At least, they seem to be.  Plaintiffs have offered evidence (unrebutted and without objection, even in the surreply by defendants) that Veolia North America has recently relocated its headquarters from Houston, Texas to downtown Indianapolis.   Pl. Ex. R at 42.   Veolia North America has been recruiting employees for positions it describes as being at its "Indianapolis, IN Corporate Headquarters."  Pl. Ex. S.

(in deciding issue of subject matter jurisdiction, district court may hear evidence and make findings of disputed facts).

The court has concluded that a hearing is not necessary.  The record presents some questions as whether Veolia North America's headquarters and nerve center has been in Illinois, or Texas, or perhaps very recently in Indiana. But the legally relevant nerve center is that of Veolia Indianapolis, and the evidence shows clearly that its nerve center is in Indiana.  The fact that Veolia Indianapolis is owned and supervised by a separate entity located elsewhere does not change the location of its own Indianapolis nerve center.  *E.g.*, *Topp v. CompAir, Inc.*, 814 F.2d at 835 (finding that district court erred by holding that subsidiary's principal place of business was location of a parent company's headquarters); accord, *Schwartz v. Electronic Data Systems, Inc.*, 913 F.2d 279, 283 (6th Cir. 1990) (holding that when parent and subsidiary maintain formal separation, diversity jurisdiction over subsidiary is determined by its own citizenship and not that of parent); *S.W.L., Inc. v. Environtech, Inc.*, No. 04-C-2984, 2004 WL 1444855, at *2 (N.D. Ill. June 28, 2004) (holding that subsidiary's principal place of business was where most of its executives and operations were located, and not where the parent company and some of the subsidiary's directors and officers were located); *Powers v. Fox Television Stations, Inc.*, 907 F. Supp. 719, 722-23 (S.D.N.Y. 1995) (finding diversity jurisdiction based on defendant

subsidiary's nerve center, which was different from location of parent company that exerted high degree of control).[7]

Defendants have not identified any cases finding that a company's nerve center was in a place where the company had no employees, no officers, and no directors.  Focusing on the location of the parent entity loses sight of the controlling question:  the principal place of business of Veolia Indianapolis itself, and not its parent.  Because Veolia Indianapolis has its principal place of business in Indianapolis, it is a citizen of Indiana.  All other criteria of CAFA's local controversy, home state controversy, and interests of justice exceptions are satisfied.  Accordingly, plaintiffs' joint motion to remand is hereby GRANTED and this case is hereby REMANDED to the Marion Superior Court from which it was removed.  By separate order, the court is also remanding the companion case.

---

[7]Courts have repeatedly recognized that where one corporation is truly only the alter ego of another, the two might be considered as one for purposes of diversity jurisdiction, but so long as the companies have maintained their separate legal status, diversity jurisdiction decisions should not require a detailed examination of the precise degree of control that a parent entity exercises over the subsidiary.  As Judge Posner explained for the Seventh Circuit in *Hoagland v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 740 (7th Cir. 2004), jurisdictional rules ought to be "simple and precise so that judges and lawyers are spared having to litigate over not the merits of a legal dispute but where and when those merits shall be litigated."  Clarity is the chief and often the only virtue of a jurisdictional rule.  Litigation over fine degrees of parental control would turn the jurisdictional decision into a morass.

So ordered.

Date: August 6, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Peter S. Kovacs
STEWART & IRWIN P.C.
pkovacs@silegal.com

Robert D. MacGill
BARNES & THORNBURG LLP
rmacgill@btlaw.com

Scott E. Murray
BARNES & THORNBURG LLP
smurray@btlaw.com

T. Joseph Wendt
BARNES & THORNBURG LLP
jwendt@btlaw.com

Matthew S. Winings
BARNES & THORNBURG
mwinings@btlaw.com